723 A.2d 45

JOHN MYRLAK, PLAINTIFF–RESPONDENT, v. PORT AUTHORITY OF NEW YORK AND NEW JERSEY AND PORT AUTHORITY TRANS–HUDSON CORPORATION, DEFENDANTS–RESPONDENTS, AND GIRSBERGER INDUSTRIES, INC., DEFENDANT–APPELLANT, AND JOHN DOE 1–5, DOE COMPANY 1–5 AND DOE CORP. 1–5, DEFENDANTS.

Argued September 14, 1998—Decided February 8, 1999.

*Michelle Wall*, argued the cause for appellant (*Melli & Wright*, attorneys).

*David L. Pennington*, argued the cause for respondent John Myrlak (*Pennington & Thompson*, attorneys; *Gary C. Chiumento* and *Philip J. Espinosa*, on the brief).

*Donald F. Burke*, argued the cause for respondent Port Authority Trans–Hudson Corporation (*Hugh H. Welsh*, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

In this strict products liability case involving one defendant, the primary issue is whether the doctrine of *res ipsa loquitur* should be applied when liability is based upon an alleged manufacturing defect. The trial court declined to instruct the jury regarding *res ipsa loquitur*. The Appellate Division held that the trial court should have given such an instruction. We disagree and reverse. We hold that the traditional negligence doctrine of *res ipsa loquitur* generally is not applicable in a strict products liability case. We adopt, however, the "indeterminate product defect test" established in Section 3 of the *Restatement (Third) of Torts: Products Liability* as the more appropriate jury instruction in cases that do not involve a shifting of the burden of persuasion.

I

On July 6, 1991, plaintiff, John Myrlak, was injured when his chair collapsed while he was at work. At that time, plaintiff was forty-three years old, six feet six inches tall, and weighed approximately 325 pounds. Plaintiff was employed as an assistant trainmaster for the Port Authority Trans–Hudson Corporation

(PATH). He worked at the Hoban Control Center at Journal Square in Jersey City. Plaintiff usually performed his duties while seated in a movable desk chair that was positioned at a semi-circular console, approximately eight feet long and three feet high.

At the time of the accident, plaintiff had been seated in the chair performing his duties for approximately one hour and forty-five minutes. He suddenly heard a loud noise, and the back of his chair cracked and gave way. Plaintiff and the chair fell backwards, causing both to land parallel to the floor. Plaintiff grabbed the arms of the chair and pulled himself forward as he was falling. He injured his lower back and was hospitalized.

Although no one other than the plaintiff actually saw the accident, several PATH employees testified that they heard either a clicking or ratcheting sound, or a loud noise like a grinding of gears. After the accident, those employees observed that the back of the chair had collapsed and was parallel to the floor. A co-worker stated that he touched the back of the chair after the accident and it appeared to be flopping back and forth. Another co-worker testified that he sat in the chair the day following the accident and found it lacked back support.

The chair involved in the accident was manufactured by defendant Girsberger Industries, Inc. It was one of five hundred chairs purchased by PATH at the same time from the same company. All of the chairs were delivered to PATH either on November 1, 1990, or on May 1, 1991, and were placed in use at the Hoban Control Center on June 1, 1991. Thus, the chair that caused plaintiff's accident had been in use for five weeks.

The chair had a high backed seat with a triple joint construction that allowed the seat to follow the user's movement by adjusting two levers. One of the levers positioned the chair in either a locked or a "free flow" mode; the other lever adjusted the height of the chair. The chair was also equipped with a tension control mechanism underneath the seat to adjust the tension of the chair's back according to the user's need or desire. Plaintiff was familiar with the chair and its operation.

There was no evidence that the chair had been misused by plaintiff or any other PATH employee. The chair, however, was not used exclusively by plaintiff. On the contrary, it was customarily used by several different PATH employees twenty-four hours each day. Although some of the PATH employees who used the chair were similar in size to plaintiff, none of them ever reported any similar incidents or complaints with regard to the chair.

Plaintiff instituted the present litigation against PATH under the Federal Employer's Liability Act (FELA), claiming that PATH failed to provide a safe workplace and was negligent in providing him with a chair that was too small for a man his size. He also filed products liability claims against the manufacturer of the chair alleging both a manufacturing and a warning defect theory of liability. Pretrial discovery left some uncertainty concerning whether the chair examined by plaintiff's expert and displayed in the court room during the trial was the same chair that was involved in the accident. However, PATH maintains that they are one and the same. To support its position, PATH presented evidence regarding the chain of custody of the chair.

Joseph Bardzilowski, Coordinator of Rail Operations for PATH, testified that he saw the chair the day after the accident and that it looked normal to him. He stated that the chair had been moved from the trainmaster's/assistant trainmaster's area to a vacant area next to the desk. He also testified that the chair had a note on it that read "Do not use." At Bardzilowski's request, the chair was removed from the Control Center and placed into a supply room on the seventh floor at Journal Square the day after the accident. Anne DiNicola, a clerk employed by PATH, testified that at the request of Bardzilowski, she tagged the chair to prevent further use. Kevin Duffy testified that at the request of his supervisor, he removed the chair from the supply closet at Journal Square and placed it in the evidence closet at the World Trade Center where it remained until he brought it to court. Duffy further testified that the evidence closet was locked and the

only persons with keys were himself and an administrative assistant. He was not aware of anyone tampering with the chair. The chair was taken from the evidence room and presented as an exhibit at the trial.

Plaintiff's expert was unable to duplicate the accident with the chair that was presented as evidence. Plaintiff's expert was not permitted to disassemble the chair, perform a failure analysis on it, or test any of its internal parts. He was allowed to operate the chair only by using the control levers. No application was addressed to the trial court to perform a more detailed analysis of the chair. The expert was unable to identify a specific defect in the chair; nor could he state that a defect caused the accident. On the issue of PATH's negligence, plaintiff's expert testified that the chair was too small for a person plaintiff's size and weight.

At the close of all of the evidence, plaintiff requested the court to charge the jury on *res ipsa loquitur* regarding the manufacturing defect claim. In denying the requested charge, the trial court stated that it wanted to avoid that phrase even though plaintiff relied on circumstantial evidence to infer that there was a manufacturing defect. The jury found PATH was negligent in failing to provide plaintiff with a safe workplace and awarded plaintiff 1.5 million dollars. The jury also found that plaintiff failed to establish a manufacturing defect in the chair.

PATH appealed and plaintiff cross-appealed. In a reported opinion, the Appellate Division reversed both verdicts and remanded for a new trial. 302 *N.J.Super.* 1, 694 *A.*2d 575 (1997). The court reversed the verdict against PATH on an evidentiary basis. *Id.* at 8–11, 694 *A.*2d 575. The propriety of that ruling is not before us. The panel also reversed the verdict in favor of the manufacturer, concluding that the trial court should have instructed the jury on *res ipsa loquitur*. *Id.* at 11–15, 694 *A.*2d 575. We granted defendant Girsberger's petition for certification, limited to the issue whether *res ipsa loquitur* should apply to this strict products liability case. 152 *N.J.* 10, 702 *A.*2d 349 (1997).

## II

Defendant Girsberger Industries, Inc. argues that the Appellate Division's opinion constitutes an unwarranted expansion of the doctrine of *res ipsa loquitur* into the field of strict products liability. It maintains that using *res ipsa loquitur* to create an inference that the product was defective violates the New Jersey Products Liability Act, *N.J.S.A.* 2A:58(c)–1 to –11(Act).

Defendant Girsberger also maintains that by allowing a *res ipsa loquitur* instruction, a plaintiff can proceed under a manufacturing defect theory without evidence of any specific defect. This, the defendant contends, improperly relieves the plaintiff of his burden of proof. An evaluation of plaintiff's claim in this case involves an analysis of both the tenets of products liability law and the traditional negligence doctrine of *res ipsa loquitur.*

### -A-

The *res ipsa loquitur* doctrine derives its roots from the common law of England. The first reported decision to apply the doctrine in a case not involving railway collisions between two trains on the same line was *Byrne v. Boadle,* 159 *Eng. Rep.* 299, 300 (Exch. of Pleas 1863). That case involved a barrel of flour that fell and struck a passerby on a street as the barrel was being lowered from a window by a flour merchant. The court held that there "are certain cases [other than the train collision cases] of which it may be said *res ipsa loquitur,* and this seems one of them." *Ibid.* The court permitted a presumption of negligence, reasoning that it was "apparent that the barrel was in the custody of the defendant who occupied the premises, . . . and . . . the fact of its falling is *prima facie* evidence of negligence, . . ., but if there are any facts inconsistent with negligence it is for the defendant to prove them." *Id.* at 301. A quarter of a century after *Byrne* was decided, a discussion of the doctrine first appeared in a reported decision in this State. *Bahr v. Lombard, Ayres & Co.,* 53 *N.J.L.* 233, 240–41, 21 *A.* 190 (E. & A. 1890) (Beasley, C.J., dissenting). Within five years thereafter, the doctrine had gained widespread

acceptance in New Jersey. *Excelsior Elec. Co. v. Sweet,* 57 *N.J.L.* 224, 228–29, 30 *A.* 553 (E. & A. 1894).

*Res ipsa loquitur,* which in Latin means "the thing speaks for itself," is a rule of law that has its origin in negligence and "governs the availability and adequacy of evidence of negligence in special circumstances." *Brown v. Racquet Club of Bricktown,* 95 *N.J.* 280, 288, 471 *A.*2d 25 (1984). *Res ipsa loquitur* is not a theory of liability; rather, it is an evidentiary rule that governs the adequacy of evidence in some negligence cases. *Ibid.* Ordinarily, negligence is a "a fact which must be proved and which will never be presumed," *Meny v. Carlson,* 6 *N.J.* 82, 91, 77 *A.*2d 245 (1950), and the burden of proving negligence in any particular case is on the plaintiff. *Buckelew v. Grossbard,* 87 *N.J.* 512, 525, 435 *A.*2d 1150 (1981). The doctrine of *res ipsa loquitur,* where applicable, is a method of circumstantially proving the existence of negligence. *Tierney v. St. Michael's Medical Center,* 214 *N.J.Super.* 27, 30, 518 *A.*2d 242 (App.Div.1986), *certif. denied,* 107 *N.J.* 114, 526 *A.*2d 184 (1987). Specifically, the doctrine permits an inference of defendant's want of due care when the following three conditions have been met: "(a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c) there 'is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect." *Bornstein v. Metropolitan Bottling Co.,* 26 *N.J.* 263, 269, 139 *A.*2d 404 (1958). If the instrumentality has left the control of the defendant before the accident, the doctrine may nevertheless be invoked where applicable if plaintiff can present evidence that the instrumentality causing the harm neither was improperly handled, nor its condition changed after the defendant relinquished control. *Jakubowski v. Minnesota Mining and Mfg.,* 42 *N.J.* 177, 183, 199 *A.*2d 826 (1964).

Whether an occurrence ordinarily bespeaks negligence is based on the probabilities in favor of negligence. Hence, *res ipsa* is available if it is more probable than not that the defendant has been negligent. *Buckelew, supra,* 87 *N.J.* at 526, 435 *A.*2d 1150;

*Tierney, supra,* 214 *N.J.Super.* at 30, 518 *A.*2d 242. The doctrine does not shift the burden of persuasion to the defendant. *Eaton v. Eaton,* 119 *N.J.* 628, 638, 575 *A.*2d 858 (1990); *Buckelew, supra,* 87 *N.J.* at 526, 435 *A.*2d 1150. Rather, what "is required of defendant is an explanation, not exculpation." *Buckelew, supra,* 87 *N.J.* at 526, 435 *A.*2d 1150. It shifts to the defendant the obligation to explain the causative circumstances because of defendant's superior knowledge. *Ibid.* The doctrine confers upon the plaintiff an inference of negligence sufficient to establish a *prima facie* case at the close of plaintiff's evidence. *Ibid.; see also Vespe v. DiMarco,* 43 *N.J.* 430, 436–37, 204 *A.*2d 874 (1964).

-B-

In a products liability case in which the plaintiff alleges a manufacturing defect under the Act, the plaintiff has the burden to prove "the product causing the harm was not reasonably fit, suitable or safe for its intended purpose." *N.J.S.A.* 2A:58C–2. In the typical manufacturing defect case, a plaintiff is not required to establish negligence. *See Zaza v. Marquess and Nell, Inc.,* 144 *N.J.* 34, 49, 675 *A.*2d 620 (1996); *Waterson v. General Motors Corp.,* 111 *N.J.* 238, 267, 544 *A.*2d 357 (1988); *Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* 229, 238, 432 *A.*2d 925 (1981). In other words, a plaintiff must impugn the product but not the conduct of the manufacturer of the product. *Prosser & Keeton on Torts,* § 99, at 695 (5th ed.1984); R. Keeton, *Products Liability—Inadequacy of Information,* 48 *Tex. L.Rev.* 398, 407–08 (1970).

The Act defines a manufacturing defect as a deviation "from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae." *N.J.S.A.* 2A:58C–2a. The Act left unchanged the three theories under which a manufacturer or seller may be held strictly liable for harm. *Jurado v. Western Gear Works,* 131 *N.J.* 375, 384, 619 *A.*2d 1312 (1993); *Dewey v. R.J. Reynolds Tobacco Co.,* 121 *N.J.*

69, 94–95, 577 *A*.2d 1239 (1990); *Fabian v. Minster Mach. Co.*, 258 *N.J.Super.* 261, 271, 609 *A*.2d 487 (App.Div.), *certif. denied*, 130 *N.J.* 598, 617 *A*.2d 1220 (1992). Section 2 of the *Restatement (Third) of Torts: Products Liability* adopts manufacturing defects as one of three categories or theories of product defects. The Restatement defines a manufacturing defect as one in which "the product departs from its intended design though all possible care was exercised in the preparation and marketing of the product." *Restatement (Third) of Torts: Products Liability* § 2(a). The Act's and the Restatement's definitions of a manufacturing defect both emphasize the safety of the product rather than the reasonableness of the manufacturer's conduct. *Becker v. Baron Bros.*, 138 *N.J.* 145, 152, 649 *A*.2d 613 (1994); *Feldman v. Lederle Labs.*, 97 *N.J.* 429, 450, 479 *A*.2d 374 (1984).

Simply because a plaintiff is not required to prove fault in a strict liability case does not mean that absolute liability will be imposed upon a manufacturer. Although a plaintiff is relieved of proving fault, that plaintiff must nonetheless prove that the product was defective under our common law jurisprudence that was incorporated into the Act. *See Jurado, supra*, 131 *N.J.* at 384, 619 *A*.2d 1312 (holding that Act did not alter our common law). Based on our well-established case law in this area, a plaintiff must prove that the product was defective, that the defect existed when the product left the manufacturer's control, and that the defect proximately caused injuries to the plaintiff, a reasonably foreseeable or intended user. *Becker, supra*, 138 *N.J.* at 151, 649 *A*.2d 613; *Coffman v. Keene Corp.*, 133 *N.J.* 581, 593, 628 *A*.2d 710 (1993); *Jurado, supra*, 131 *N.J.* at 385, 619 *A*.2d 1312; *Feldman, supra*, 97 *N.J.* at 449, 479 *A*.2d 374; *O'Brien v. Muskin Corp.*, 94 *N.J.* 169, 179, 463 *A*.2d 298 (1983); *Michalko v. Cooke Color & Chem. Corp.*, 91 *N.J.* 386, 394, 451 *A*.2d 179 (1982).

A product is deemed to be defective if it is not reasonably fit, suitable, or safe for the ordinary or foreseeable purpose for which it is sold. *See Waterson, supra*, 111 *N.J.* at 267, 544 *A*.2d 357. As noted previously, a manufacturing defect

under the Act occurs when the product comes off the production line in a substandard condition based on the manufacturer's own standards or identical units that were made in accordance with the manufacturing specifications. *N.J.S.A.* 2A:58C–2a; *Navarro v. George Koch & Sons, Inc.*, 211 *N.J.Super.* 558, 576, 512 *A.*2d 507 (App.Div.) *certif. denied,* 107 *N.J.* 48, 526 *A.*2d 138 (1986).

To prove both the existence of a defect and that the defect existed while the product was in the control of the manufacturer, a plaintiff may resort to direct evidence, such as the testimony of an expert who has examined the product, or, in the absence of such evidence, to circumstantial proof. *Scanlon v. General Motors Corp.,* 65 *N.J.* 582, 591, 326 *A.*2d 673 (1974); *Manieri, supra,* 151 *N.J.Super.* at 430–31, 376 *A.*2d 1317. The law is "settled in this State that in a products liability case the injured plaintiff is not required to prove a specific manufacturer's defect." *Moraca v. Ford Motor Co.,* 66 *N.J.* 454, 458, 332 *A.*2d 599 (1975). Proof that a product is not fit for its intended purposes "requires only proof ... that 'something was wrong' with the product." *Scanlon, supra,* 65 *N.J.* at 591, 326 *A.*2d 673. The mere occurrence of an accident and the mere fact that someone was injured are not sufficient to demonstrate the existence of a defect. *Ibid.; Zaza, supra,* 144 *N.J.* at 49, 675 *A.*2d 620.

Under the *Scanlon* circumstantial evidence method of proving a product defect, the fact that a product is relatively new does not suffice by itself to establish a defective condition. *Scanlon, supra,* 65 *N.J.* at 592–93, 326 *A.*2d 673. The age and prior usage of the product in relation to its expected life span are factors to consider in conjunction with other evidence presented. *Id.* at 593, 595, 326 *A.*2d 673. Generally, the older a product is, the more difficult it is to prove that a defect existed while in the manufacturer's control. *Id.* at 593, 326 *A.*2d 673; *Prosser, supra,* § 99, at 696. However, age of the product alone may not preclude a finding that the product was defective when the product is "of a type permitting the jury, after weighing all the evidence ..., to infer that in the normal course of human experience an injury

would not have occurred at this point in the product's life span had there not been a defect attributable to the manufacturer." *Scanlon, supra,* 65 *N.J.* at 593, 326 *A.*2d 673. *Scanlon* held that this critical inference could not be drawn when the product in question, a complicated automobile, was nine months old and had only 4,000 miles of use. *Id.* at 599, 326 *A.*2d 673.

In addition to the direct and circumstantial evidence methods of proving a product defect, a plaintiff has a third option. A plaintiff may establish a defect by "negat[ing] other causes of the failure of the product for which the defendant would not be responsible, in order to make it reasonable to infer that a dangerous condition existed at the time the defendant had control [of the product]." *Id.* at 593–94, 326 *A.*2d 673 (citing *Jakubowski, supra,* 42 *N.J.* at 184, 199 *A.*2d 826). Under that approach, a plaintiff does not have to negate all possible causes of failure, only those likely causes of failure. *Id.* at 594, 326 *A.*2d 673. Both *Moraca* and *Scanlon* involved alleged defects in automobiles that were relatively new with low mileage. *Moraca* is similar to the present case in that the plaintiff there heard a "gink" while driving the car and the steering mechanism suddenly locked, causing the vehicle to skid off the road into a tree. 66 *N.J.* at 459, 332 *A.*2d 599. Although *res ipsa* was not charged to the jury in *Moraca,* the jury was nonetheless allowed to infer a defect from the circumstances. *Id.* at 460, 332 *A.*2d 599.

-C-

Based on the foregoing legal principles synthesized from our products liability and *res ipsa loquitur* jurisprudence, it is evident that there are some technical differences between using *res ipsa loquitur* as a method of proving negligence and using that doctrine to prove a product defect in strict products liability cases. *Res ipsa loquitur* is a doctrine created under the fault theory of negligence as a means of circumstantially proving a defendant's lack of due care. Strict products liability, on the other hand, is a theory of liability based upon allocating responsibility regardless

of a defendant's unreasonableness, negligence, or fault. Nonetheless, except in those rare cases in which the application of *res ipsa loquitur* also involves a shifting of the burden of persuasion, there may be sound reasons to adopt a *res ipsa*-like method of circumstantially proving a product defect.

Apart from the theoretical differences between strict products liability and the doctrine of *res ipsa loquitur*, we must determine whether the Legislature's intent in passing the Act militates against the use of *res ipsa* as a method of establishing the existence of a defect in strict products liability cases. The Act provides that manufacturing defect claims "are to be determined according to the existing common law of the State." Comment to *N.J.S.A.* 2A:58C–1; *see also* Judiciary Committee, *Statement to Senate Bill No. 2805*, at 1 (March 23, 1987). The Act also provides that unless stated otherwise, it was not the intent of the Act to establish or alter any existing rules "with respect to the burden of proof in a product liability action." *N.J.S.A.* 2A:58C–7.

In *Corbin v. Camden Coca–Cola Bottling Co.*, 60 *N.J.* 425, 435–36, 290 *A.*2d 441 (1972), the Court adjured that a *res ipsa loquitur* jury charge should not be given because it "does nothing to aid the jury." *Corbin* involved a breach of warranty claim against a single products liability defendant. The doctrine of *res ipsa loquitur*, however, has been applied in cases involving multiple defendants and multiple theories of liability such as negligence and products liability. *See, e.g., Anderson v. Somberg*, 67 *N.J.* 291, 338 *A.*2d 1, *cert. denied*, 423 *U.S.* 929, 96 *S.Ct.* 279, 46 *L. Ed.*2d 258 (1975); *Maciag v. Strato Med. Corp.*, 274 *N.J.Super.* 447, 644 *A.*2d 647 (App.Div.1994); *McGuinness v. Wakefern Corp.*, 257 *N.J.Super.* 339, 608 *A.*2d 447 (Law 1991). The *Anderson*-type cases utilize collective *res ipsa loquitur* in that both the burden of coming forward with evidence and the burden of persuasion are shifted to the defendants. *Anderson, supra*, 67 *N.J.* at 298–303, 338 *A.*2d 1.

*Anderson* and its progeny are cases involving unique circumstances in which a clearly helpless or anesthetized plaintiff suf-

fered physical injury as a result of acts involving multiple defendants. In those cases, "it was apparent that at least one of the defendants was liable for plaintiff's injury because no alternative theory of liability was within reasonable contemplation." *Anderson, supra,* 67 *N.J.* at 298, 338 *A.*2d 1. The plaintiffs in those cases were clearly blameless. All of our reported decisions in which a *res ipsa* instruction was utilized in a products liability context involve the same set of highly fact-sensitive circumstances: a plaintiff sued multiple defendants on multiple theories of liability; all possible defendants were before the court; it was clear that at least one of those defendants was responsible for the plaintiff's injuries; and the plaintiff was either helpless, anesthetized, or in a situation in which he or she clearly had less information than the defendants concerning the cause of the injuries. Those special facts are simply not present in the vast majority of strict products liability cases, including the present one.

There is no precedent in this State permitting a *res ipsa loquitur* charge in a commonplace products liability case that involves only a single defendant. A few other jurisdictions, however, have permitted the use of that doctrine. In *Williams v. Emerson Elec. Co.,* 909 *F.Supp.* 395, 398 (D.La.1995), a district court permitted a 275-pound plaintiff who fell from a ladder after it buckled beneath him to use the doctrine to prove that a manufacturing defect might have caused the accident. *Id.* at 396, 399. A Louisiana appellate court had previously reached a similar conclusion in *State Farm Mut. Auto. Ins. Co. v. Wrap-On Co.,* 626 *So.*2d 874, 877 (La.Ct.App.1993). The Ninth Circuit interpreting Hawaii law also held that "nothing bars application of the *res ipsa loquitur* theory to strict liability." *Jenkins v. Whittaker, Corp.,* 785 *F.*2d 720, 733 (9th Cir.1986).

The majority of jurisdictions that have addressed the issue do not allow *res ipsa loquitur* to be used in a strict products liability cause of action. Jonathan M. Hoffman, *Res Ipsa Loquitur and Indeterminate Product Defects: If They Speak for Themselves, What Are They Saying?,* 36 *S. Tex. L.Rev.* 353, 373 (1995). *See*

*generally Whitted v. General Motors, Corp.*, 58 *F.*3d 1200, 1208 (7th Cir.1995) (applying Indiana law held that *res ipsa loquitur* charge may not be given, but circumstantial evidence may be used to prove a product defect); *Welge v. Planters Lifesavers Co.*, 17 *F.*3d 209, 211 (7th Cir.1994) (applying Illinois law declared that *res ipsa loquitur* is not applicable to products liability cases); *Brooks v. Colonial Chevrolet–Buick, Inc.*, 579 *So.*2d 1328, 1333 (Ala.1991) (stating *"res ipsa loquitur* is not applicable in products liability cases"); *Tresham v. Ford Motor Co.*, 275 *Cal.App.*2d 403, 407, 79 *Cal.Rptr.* 883 (Cal.Ct.App.1969) (stating "an instruction embodying the doctrine of *res ipsa loquitur* in strict liability cases is not legally supportable"); *Ford Motor Co. v. Reed*, 689 *N.E.*2d 751, 754 (Ind.Ct.App.1997) (stating "products liability and the doctrine of *res ipsa loquitur* are antithetical"); *Brothers v. General Motors Corp.*, 202 *Mont.* 477, 658 *P.*2d 1108, 1110 (Mont.1983) (stating *res ipsa* is applied to human conduct, not defective products); *Fulton v. Pfizer Hosp. Products Group, Inc.*, 872 *S.W.*2d 908, 912 (Tenn. Ct.App.1993) (holding that doctrine "has application only to the law of negligence and does not apply in a products liability case").

 We agree with the majority of jurisdictions that, ordinarily, the traditional *res ipsa loquitur* jury charge should not be used in strict products liability actions. As noted previously, *res ipsa loquitur* is a negligence doctrine; it is a circumstantial means of proving a defendant's lack of due care. *Tierney, supra*, 214 *N.J.Super.* at 30, 518 *A.*2d 242. Strict liability, on the other hand, is a theory of liability based on allocating responsibility regardless of a defendant's unreasonableness, negligence or fault. *Waterson, supra*, 111 *N.J.* at 238, 544 *A.*2d 357. Thus, while *res ipsa* might demonstrate a manufacturer's negligence in failing to inspect or appropriately assemble a particular product, strict liability merely questions whether there is a defect in that product that existed before it left the manufacturer's control. *See Feldman, supra*, 97 *N.J.* at 449, 479 *A.*2d 374. Furthermore, a strict products liability case by its nature implies that the product will have left the control of the manufacturer. *See* Hoffman, *supra*, 36 *S. Tex.*

*L.Rev.* at 360. We reaffirm the Court's holding in the *Anderson*-type cases in which collective *res ipsa loquitur* is applied and the burden of persuasion is shifted to the defendants.

Even if we were to hold that the doctrine should be applied to a commonplace products liability case involving a single defendant, the trial court properly refused to give the jury a *res ipsa loquitur* charge in the present case. The chair had been in use for about five weeks. It was used twenty-four hours a day by at least three different persons of various weights and sizes. Although there was no evidence of misuse, multiple intended users had many opportunities to adjust the tension on the back of the chair to meet their personal needs. It cannot be said that simply because the back of the chair collapsed when plaintiff placed his weight against it, the chair was defective. The accident could not be replicated and no defect was found by any expert. The proofs—direct, circumstantial, and that negating of other causes—simply failed to show that collapse of the chair while the 325–pound plaintiff sat in it meant the chair was defective based on a balancing of the probabilities. *See Lynch v. Galler Seven–Up Pre–Mix Corp.,* 74 *N.J.* 146, 153, 376 *A.*2d 1211 (1977) (holding that soda canister that was set-up for use for about two weeks before it exploded precluded *res ipsa loquitur* charge because of frequent handling by third persons).

-D-

We recognize that as an alternative to a traditional *res ipsa loquitur* instruction, various states and commentators have advocated an intermediate-type approach for circumstantially proving the existence of a product defect. That approach appears to best serve the interest of all parties and is not inconsistent with the Act.

The *Scanlon* rule regarding circumstantial proof of a defect in a strict products liability case was adopted recently in

the *Restatement (Third) of Torts: Products Liability.* It pro-
vides:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:
> (a) was of a kind that ordinarily occurs as a result of a product defect; and
> (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.
>
> *[Restatement (Third) of Torts* § 3 (1997).]

The Restatement test for circumstantial evidence of a product defect is similar to *res ipsa loquitur* in that it is an inferential test. Our Model Jury Charge on *res ipsa loquitur* instructs the jury:

> [I]f you find by the greater weight of the evidence that at the time of the incident (1) the defendant had exclusive control of the instrumentality causing the occurrence, (2) that the circumstances were such that in the ordinary course of events the incident would not have occurred if the defendant had exercised reasonable care and (3) plaintiff's voluntary act or negligence did not contribute to the occurrence, then you may infer that the defendant was negligent.
>
> [Model Jury Charge (Civil) § 5.13.]

Although Section 3 of the Restatement is based on a *res ipsa* model, it permits the jury to draw two inferences: that the harmful incident was caused by a product defect, and that the defect was present when the product left the manufacturer's control. The *res ipsa loquitur* doctrine, on the other hand, creates the single inference of negligence. Nevertheless, Section 3 of the Restatement parallels the elements of our *res ipsa loquitur* doctrine. As noted previously, the requirements that the product was in the defendant's exclusive control at the time of the harmful incident under *res ipsa loquitur,* and that the defect occurred before the product left the control of the manufacturer, can be satisfied through direct and circumstantial evidence as well as by evidence negating other causes for the failure of the product for which the defendant would not be responsible. Moreover, even those jurisdictions that find that *res ipsa* is not specifically applicable to a strict products liability action have recognized that the inferences and principles that form the core of *res ipsa* "merely instantiates the broader principle, which is as applicable to a products case as to any other tort case, that an accident can

itself be evidence of liability [,] . . . if it is reasonably plain that the defect was not introduced after the product was sold." *Welge, supra,* 17 *F.*3d at 211; *Williams v. Smart Chevrolet Co.,* 292 *Ark.* 376, 730 *S.W.*2d 479, 482 (Ark.1987); *Lang v. Federated Dep't Stores.,* 161 *Ga.App.* 760, 287 *S.E.*2d 729, 731 (Ga.Ct.App.1982). We agree with that analysis.

Section 3 of the Restatement has been referred to as the "indeterminate product test" because its use is limited to those product liability cases in which the plaintiff cannot prove a specific defect. Hoffman, *supra,* 36 *S. Tex. L.Rev.* at 356. A plaintiff can satisfy the requirements of Section 3 of the Restatement the same way as in the case of *res ipsa loquitur,* by direct and circumstantial evidence as well as evidence that negates causes other than product defect.

Other jurisdictions have adopted similar circumstantial methods for establishing an inference of a product defect in strict products liability cases. We agree with those states that in some cases, "common experience indicates that certain accidents do not occur absent some defect," and therefore an inference of a defect under specific circumstances should be permitted. Matthew R. Johnson, Note, *Rolling the "Barrel" a Little Further: Allowing Res Ipsa Loquitur to Assist in Proving Strict Liability in Tort Manufacturing Defects,* 38 *Wm. & Mary L.Rev.* 1197, 1225 (1997). *See also Williams, supra,* 292 *Ark.* at 382, 730 *S.W.*2d at 482 (Ark. 1987) (stating that "[t]he plaintiff is not required to prove a specific defect when common experience tells us that the accident would not have occurred in the absence of a defect"); *Embs v. Pepsi–Cola Bottling Co.,* 528 *S.W.*2d 703, 706 (Ky.1975) (quoting Henry David Thoreau, the court states that " '[s]ome circumstantial evidence is very strong, as when you find a trout in the milk' "); *Crump v. MacNaught P.T.Y. Ltd.,* 743 *S.W.*2d 532, 535 (Mo.Ct.App.1987) (finding that common sense suggests handles do not usually fly off pumps); *Bombardi v. Pochel's Appliance & TV Co.,* 10 *Wash.App.* 243, 518 *P.*2d 202, 204 (Wash.Ct.App.1973) (implying that common sense would lead jury to conclude that

television set was defective because it caught on fire). Fifteen other states have adopted the principles incorporated into Section 3 of the Restatement. *See* Reporters' Notes to Section 3, at 115–18. We also adopt the indeterminate product defect test announced in Section 3 of the Restatement.

Our decision to adopt Section 3 of the Restatement is compelled by the decisional law in this State. *Alloway v. General Marine Indus.*, 149 *N.J.* 620, 695 *A.*2d 264 (1997); *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 626 *A.*2d 445 (1993). Indeed, this Court in *Corbin* acknowledged that a *res ipsa*-like jury charge that permitted a jury to infer a defect in a carton was appropriate given the circumstantial evidence presented. *Corbin, supra*, 60 *N.J.* at 436, 290 *A.*2d 441. For nearly a century before the Act became effective, the evolving common law of this State established a policy of creating evidentiary rules that permit an injured plaintiff to circumstantially prove the existence of negligence when certain specific conditions could be satisfied. By the time Section 3 of the Restatement was approved, *res ipsa loquitur* had evolved to the point in New Jersey that even if the instrumentality causing the harm had left the control of the defendant prior to the accident, the doctrine could still be invoked if the appropriate evidence was presented. That evidentiary rule then shifted to the defendant the obligation to explain the causative circumstances of the defendant's superior knowledge.

Because the historical antecedent to Section 3 of the Restatement is traceable to the negligence doctrine of *res ipsa loquitur,* the American Law Institute was mindful of the parallel between drawing an inference of negligence in an appropriate case and drawing an inference of product defect under similar circumstances when it approved Section 3 of the Restatement. That section was adopted to "set forth the formal requisites for drawing an inference" in some product defect cases. Restatement § 3, comment a.

Consequently, Section 3 of the Restatement in a products liability case does precisely what *res ipsa loquitur* does in a

negligence context. We are persuaded, therefore, that our adoption of Section 3 of the Restatement is consistent with the policy that drives *res ipsa*. Like our traditional *res ipsa loquitur* charge, there is no shifting of the burden of proof under a jury charge based on Section 3 of the Restatement.

Our independent review of the record, including a consideration of the jury charge as a whole, *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973); *State v. Kamienski*, 254 *N.J.Super.* 75, 85, 98, 603 *A.*2d 78 (App.Div.), *certif. denied*, 130 *N.J.* 18, 611 *A.*2d 656 (1992), convinces us that the trial court adequately informed the jury that it could rely on circumstantial evidence to "infer that there was a defect by reasoning from circumstances and the facts shown." Hence, plaintiff was not prejudiced by the absence of a *res ipsa loquitur* jury charge even if one had been required. Moreover, the circumstantial evidence charge that was given was equivalent to the indeterminate product test charge under Section 3 of the Restatement.

## III

Finally, we must decide whether our reversal of the Appellate Division's requirement of a *res ipsa loquitur* charge nonetheless requires a new trial on the products liability claim.

One of the reasons the Appellate Division reversed the judgment in favor of PATH was because the trial court excluded opinion testimony from Stan Johnson, Girsberger's plant manager. 302 *N.J.Super.* at 9–10, 694 *A.*2d 575. PATH's proffer of evidence from Johnson revealed that he would testify concerning what would have had to be broken on the chair if plaintiff's version of the accident was credible. The Appellate Division concluded that because of Johnson's familiarity with the manufacturing process, he "could have revealed Girsberger's standards, that is, the manufactured capability of the chair. PATH was prejudiced by the exclusion of this evidence . . ., and plaintiff was prejudiced because its exclusion prevented him from proving a manufacturing defect." *Id.* at 10, 694 *A.*2d 575. In addition, the Appellate Division

inferred that the trial court improperly excluded as hearsay Johnson's proffer of the results of testing the load capacity of the chair's seat and back without exploring whether that evidence was admissible as an exception to the hearsay exclusion rule, possibly pursuant to *N.J.R.E.* 803(c)(6) and *N.J.R.E.* 808. The Appellate Division also observed that "[b]y requiring proof of a deviation from the manufacturer's standards, after the proffered evidence thereof had been excluded, the jury could not fairly evaluate the claim of manufacturing defect." 302 *N.J.Super.* at 13, 694 *A.*2d 575.

In view of the Appellate Division's analysis, it is apparent that vacating the judgment in favor of Girsberger was not based solely on the trial court's failure to charge the jury regarding *res ipsa loquitur*. Rather, the reversal was based on both the absence of a *res ipsa loquitur* charge and the exclusion of evidence vital to plaintiff's ability to establish a manufacturing defect. Consequently, a new trial is required on plaintiff's strict products liability claims as well.

 Because we have adopted Section 3 of the Restatement, upon retrial, plaintiff need not prove a specific defect in the chair if he can establish that the incident that harmed him is of the kind that ordinarily occurs as a result of a product defect, and that the incident was not solely the result of causes other than product defect existing at the time the chair left Girsberger's control. *Restatement (Third) of Torts* § 3(a) and (b). If plaintiff cannot satisfy those requirements, he is not entitled to have the jury charged regarding an inference of a product defect, and plaintiff would be obligated to establish one or more manufacturing defects required by the Act, *N.J.S.A.* 2A:58C–2a.

That part of the Appellate Division's judgment requiring a *res ipsa loquitur* charge on the manufacturing defect claim is reversed. The matter is remanded to the Law Division for further proceedings as otherwise directed by the Appellate Division.

*For affirmance in part; reversal in part*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.